# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA *ex rel.*
DAVID FREEDMAN,

                Plaintiffs-Relator,

v.

MUSC STRATEGIC VENTURES,

                Defendants.

2:25-cv-13592-DCN
Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

## I.    INTRODUCTION

1.    This is an action brought by David Freedman ("Plaintiff", "Plaintiff-Relator" or "Relator") to recover damages, civil penalties, and other relief on behalf of the United States (the "United States" or the "Federal Government") arising from false and fraudulent claims made and caused to be made by MUSC Strategic Ventures ("MUSC SV"), and/or their agents and employees, in conspiracy with BAYADA Home Health Care, Inc., its successors and assigns ("BAYADA"), against Government Health Care Programs, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended by the Fraud Enforcement and Recovery Act of 2009 and the Patient Protection and Affordable Care Act of 2010 ("the FCA" or "the Act").

2.    BAYADA is a $1.85 billion revenue national home health care company. One of its primary business models relies on purchasing patients and patient referrals. This practice distorts patient choice and violates both the plain language of the Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and the purpose behind its prohibitions.

3.    BAYADA's AKS violations led to the submission of tens of millions of dollars in false claims for payment fraudulently tainted by kickbacks.

4.    In September 2021, BAYADA agreed to pay $17 million to settle the claims brought by the United States and Relator in this lawsuit, alleging that BAYADA paid a kickback to Watermark Retirement Communities, Inc. ("Watermark") by purchasing two of its home health agencies located in Arizona to induce referrals to BAYADA of Medicare beneficiaries from retirement communities operated by Watermark throughout the United States, and that from January 1, 2014 through October 31, 2022, BAYADA and its affiliated companies submitted false claims for payment to Medicare for services provided to beneficiaries referred to BAYADA as a result of the Watermark kickback transaction.

5.    In August 2023, Watermark agreed to pay $4.25 million to settle the claims brought by the United States and Relator in this lawsuit, alleging that Watermark caused the submission of false claims for payment to Medicare for services provided to beneficiaries Watermark referred to BAYADA from Watermark residential communities, and that in violation of the AKS, Watermark knowingly and willfully solicited BAYADA to purchase the two home health agencies in order to induce referrals of Medicare beneficiaries living in Watermark residential communities to home health agencies operated by BAYADA.

6.    This Complaint's focus is, as explained in detail below, to seek relief against MUSC SV, another participant in BAYADA's kickback schemes.

## II.    TWO NEARLY IDENTICAL SCHEMES THAT PRODUCED FALSE CLAIMS TO GOVERNMENT PAYORS

### A.    SCHEME 1:  Cape May

7.    Following its 2014 illegal referral scheme with Watermark, in 2015, BAYADA created a joint venture with a hospital (Cape Regional Medical Center or "CRMC") to provide home health care in Cape May County, New Jersey (the "County").  CRMC received a 50% ownership in the joint venture, providing $350,000 in capital plus patient referrals.  CRMC

provided no services to the joint venture—its essential role was to provide patient referrals to the joint venture. BAYADA provided all the services and billed Medicare on behalf of the joint venture.

8. Given the size and projected profitability of the joint venture, the $350,000 capital investment by CRMC did not justify anything close to a 50% equity interest. Thus, BAYADA's grant of a 50% ownership to CRMC was an illegal payment of "something of value" to induce referrals. CRMC was complicit in the scheme.

**B. SCHEME 2: MUSC and MUSC SV**

9. In 2016, BAYADA replicated the CRMC patient referral scheme, but in South Carolina. BAYADA and MUSC SV created a joint venture home health agency named SCHHA, LLC to provide home health care in South Carolina to patients discharged from the Medical University of South Carolina ("MUSC"). Even though BAYADA was to provide all of the services, it gave MUSC SV a 49% ownership interest in the joint venture. All that MUSC SV provided in return was $245,000 in initial capital, plus arranging for MUSC's patient referrals to the home health joint venture. The two members of the joint venture (SCHHA, LLC) are BAYADA and MUSC SV.

10. Given the projected size and revenue of the joint venture, a mere $245,000 capital contribution did not justify a 49% ownership interest. Instead, it is clear, from the economics of the arrangement, written communications and the joint venture's activities, that BAYADA's intent in offering MUSC SV the 49% ownership interest ("something of value") was in exchange for MUSC SV arranging for patient referrals generated and facilitated by MUSC. Like Watermark and CRMC, MUSC SV has been complicit in this scheme.

11. A very high percentage of the joint venture's home health billings were to come from patients referred by MUSC. Thus, the claims submitted to Medicare on account of

home health services provided to those patients were tainted by AKS violations and are false under the FCA.

## III. THE NEW JERSEY *QUI TAM* ACTION

12. Plaintiff is proceeding on AKS and FCA claims against CRMC and the County, among other defendants, in the United States District Court for the District of New Jersey, Civil Action No. 17-cv-06267-ESK-AMD (the "New Jersey FCA Case").

13. Plaintiff filed his original FCA complaint in the New Jersey FCA Case on August 18, 2017, in camera and under seal pursuant to 31 U.S.C. § 3730.  (ECF No. 1.)

14. On June 6, 2018, Plaintiff filed an amended complaint that named MUSC as a defendant, and identified MUSC SV as BAYADA's 49% joint venture partner in an LLC called SCHHA LLC, a Delaware LLC (dba MUSC Health at Home, by BAYADA).  (ECF No. 2.) The amended complaint was filed in camera and under seal pursuant to 31 U.S.C. § 3730.

15. On June 30, 2021, Plaintiff filed a second amended complaint again naming MUSC as a defendant, and again identifying MUSC SV's role.  (ECF No. 16.)  The second amended complaint was filed in camera and under seal pursuant to 31 U.S.C. § 3730.

16. On August 31, 2023, the District of New Jersey entered an order unsealing the second amended complaint.  (ECF No. 40.)

17. On May 7, 2024, the federal court in the New Jersey FCA Case granted Plaintiff's motion for leave to amend and file a third amended complaint, granting Plaintiff leave to remove MUSC as a defendant and replace it with MUSC SV, over MUSC's objections, under Fed. R. Civ. P. Rule 15(c) because the amendment related back to the date of the operative amended complaint that first implicated MUSC SV.  (ECF Nos. 135 and 136.)

18. On May 8, 2024, Plaintiff filed his third amended complaint, naming MUSC SV as a defendant.  (ECF No. 139.)

19.    On August 23, 2024, MUSC SV filed a motion to sever, transfer, or dismiss Plaintiff's third amended complaint.  (ECF No. 172.)

20.    On September 30, 2025 (ECF No. 195), the District of New Jersey granted in part and denied in part MUSC SV's motion to sever, transfer, or dismiss the third amended complaint, and dismissed all claims against MUSC SV in the third amended complaint for improper venue.  In its September 30, 2025 opinion (ECF No. 194), the District of New Jersey clarified that:

> However, to avoid potential confusion for the transferee court, the preferable procedure is to dismiss the severed claims against MUSC SV and permit Relator to file a new complaint against MUSC SV in the appropriate court in South Carolina.  A transfer of only the severed claims against MUSC SV would be procedurally cumbersome.  That procedure would require the Relator, after transfer, to file a further amended complaint, which would allege only the claims against MUSC SV.  Accordingly, I will dismiss the severed claims against MUSC SV for improper venue.

(*Id.* at 9.)

21.    On November 5, 2025, the District of New Jersey entered an order (ECF No. 218) amending its September 30, 2025 order to read that "Any applicable statute of limitations as to Plaintiff-Relator's claims against MUSC SV are hereby deemed tolled from the filing of the claims against MUSC SV through November 28, 2025."  (*Id.* at 2.)

## IV.    THE FCA

22.    The FCA was enacted during the Civil War, and later amended to enhance the ability of the Government to recover losses sustained as a result of fraud against it.  Congress intended the amendments to create incentives for individual citizens with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

23.    The FCA prohibits, *inter alia*:  knowingly presenting (or causing to be presented) a false or fraudulent claim for payment or approval; knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and, conspiring to commit any of these acts.  31 U.S.C. §§ 3729(a)(1)(A), (B), (G), and (C).  Any person who violates the FCA is liable for a civil penalty of up to $21,916 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1); Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133, *https://www.federalregister.gov/documents/2017/02/03/2017-01306/civil-monetary-penaltiesinflation-adjustment-for-2017*.

24.    For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that a defendant specifically intended to commit fraud.  *Id*.  Unless otherwise indicated, whenever the words "know," "learn," "discover" or similar words indicating knowledge are used in this Complaint, they mean "knowingly" as defined in the FCA.

25.    The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  The FCA requires that the complaint be filed under seal (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the lawsuit. The person bringing the action is known under the FCA as the "relator."

26.     Based on the foregoing federal FCA provisions, *qui tam* Plaintiff-Relator seeks, through this action, to recover damages and civil penalties arising from MUSC SV's knowing fraud against the United States, which has resulted in an estimated $59.4 million of false or fraudulent claims to Government Health Care Programs from January 2017 to date, and continuing, associated with the home health agency referrals, in addition to false claims associated with the joint venture's hospice.

27.     The allegations set forth in this Complaint, as originally pleaded in the New Jersey FCA Case, have not been publicly disclosed within the meaning of the FCA, as amended, 31 U.S.C. § 3730(e)(4).  In the alternative, if the Court finds that there was a public disclosure of such allegations before the filing of the New Jersey FCA Case, and by extension this Complaint, Relator is an "original source" as that term is used in the federal FCA.  *Id.*  The allegations made herein arise from Relator's direct and independent knowledge, and Relator voluntarily disclosed and provided his information to the Federal Plaintiff prior to filing this lawsuit.  Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that materially adds to, any publicly disclosed allegations or transactions that may prove to have occurred.

28.     To Relator's knowledge, there are no prior pending complaints against MUSC SV alleging similar facts related to MUSC SV's fraudulent scheme with BAYADA.

29.     Prior to the filing of this Complaint, Relator made substantive disclosures to the Government of facts and evidence underlying the allegations in this Complaint.

## V.     JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confer jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

31.     This Court has personal jurisdiction over MUSC SV pursuant to 31 U.S.C. § 3732(a) because MUSC SV can be found in and transacts substantial business in this district, including business related to its concerted misconduct at issue in this Complaint.

32.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1391, and 1395(a), because a substantial part of the events giving rise to the claims occurred in this District, and MUSC SV resides in and/or transacts business in this District by, among other things, administering home health care services, operating a major medical center, and engaging in illegal arrangements to pay and receive kickbacks to induce patient referrals made within this District.

## VI.     PARTIES

33.     Plaintiff, the United States of America, is the real party in interest with respect to the federal FCA *qui tam* claim herein.  At this time, Plaintiff-Relator David Freedman is pursuing causes of action on behalf of the named Plaintiff the United States on the FCA *qui tam* claim set forth herein pursuant to 31 U.S.C. § 3730(b).

34.     Plaintiff-Relator David Freedman is a citizen of Washington (as of the filing of this Complaint) and served as BAYADA's Director of Strategic Growth from January 2009 until August 2016.  Mr. Freedman is familiar with and has personal knowledge of the MUSC SV transaction, through his role at BAYADA.

35.     Defendant MUSC Strategic Ventures was incorporated on September 2, 2015 pursuant to the South Carolina Nonprofit Corporation Act to allow affiliation with tax-exempt entities to operate, promote and support MUSC and University Medical Associates ("UMA").   MUSC SV was first formed under the name "MUSC Health" and became "MUSC Strategic Ventures" in December 2015.  UMA is a nonprofit corporation organized under

the laws of South Carolina in 1991, which has three for-profit subsidiaries and a nonprofit subsidiary which are subject to federal income tax.

## VII.    APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS

### A.    Government Health Care Programs

36.    The Health Insurance for the Aged and Disabled Program, known as Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), is a health insurance program administered by the United States Government and funded by taxpayer revenue.  The United States Department of Health and Human Services ("HHS"), through its Centers for Medicare and Medicaid Services, oversees Medicare.

37.    Medicare was designed to be a health insurance program and to provide for payment of, among other things, medical services and equipment to persons over 65 years of age and certain others who qualify under Medicare's terms and conditions.  The Medicare program has four parts:  Part A, Part B, Part C and Part D.  Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, home health nursing aides and diagnostic testing facilities.  *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).  Medicare Part A and/or Part B cover some home health care services, including those provided by BAYADA.  Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

38.    Together, Medicare and any other government-funded health care program are referred to as "Government Health Care Programs."

39.     Providers that wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, including without limitation, the federal AKS and the Stark law.  *See, e.g.*, Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).  *See generally* https://www.cms.gov/medicare/enrollment-renewal/providers-suppliers/chain-ownership-system-pecos/enrollment-applications.

40.     Claims submitted by health care providers to Government Health Care Programs contain similar representations and certifications.  *See, e.g.*, Form CMS-1450 (UB-04) (institutional provider paper claim form for Medicare and Medicaid); 837I (electronic version of Form CMS-1450).

41.     When submitting a claim for payment, a provider does so subject to and under the terms of its certification to the United States that the services were delivered in accordance with federal law, including, for example, Government Health Care Program laws and regulations.

42.     Government Health Care Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the FCA.  The Centers for Medicare & Medicaid Services ("CMS") and its fiscal agents will not pay claims for services provided in violation of relevant state or federal laws, including the AKS, 42 U.S.C. § 1320a-7b(b).

B.     **The FCAs**

43.     The FCA creates liability for "any person who," among other things:

a.     "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

b.     "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

c.     "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

d.     "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

44.     The FCA further provides that any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, further increases the civil penalty. 82 Fed. Reg. 9131, 9133 (Feb. 3, 2017).

45.     The FCA provides that "the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

46.     The FCA provides that "the term 'claim' – (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or

agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2).

47.     The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 31 U.S.C. § 3729(b)(3).  Moreover, in the health care context, such as Medicare, an obligation is defined as any "overpayment retained by a person after the deadline for reporting and returning the overpayment", and an overpayment must be reported "by the later of…60 days after the date on which the overpayment was identified…or the date any corresponding cost report is due, if applicable." Social Security Act § 1128J(d); *see also* 42 U.S.C. § 1320a-7k(d) (describing the obligation to report overpayments within 60 days).

48.     The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**C.      The Anti-Kickback Law of the United States**

49.     The AKS, 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1972 and has been amended many times since.  The AKS arose out of Congressional concern that payoffs to those who can influence health care decisions corrupt medical decision-making and result in the provision of goods and services that are medically inappropriate, unduly costly, medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.

To protect the integrity of Government Health Care Programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

50.     The AKS prohibits any person or entity from soliciting or receiving or offering or paying any remuneration to induce any person to refer an individual for a service for which payment may be made under a federally-funded health care program.     42 U.S.C. § 1320a-7b(b).   The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback).   The statute provides that whoever violates these prohibitions "[s]hall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both."   42 U.S.C. § 1320a-7b(b).  The AKS further defines "remuneration" to include "transfers of items or services for free or for other than fair market value."  *Id.* § 1320a-7a(i)(6).

51.     Underscoring the breadth of the statutory definition, the Health and Human Services Office of Inspector-General (HHS-OIG) has interpreted the term "remuneration" to cover "anything of value in any form or manner whatsoever."   *OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35958 (July 29, 1991); s*ee also United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 03-cv-00167, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008).

52.     A monetary payment can constitute remuneration in violation of the AKS, as can referrals including a *quid pro quo* arrangement in which parties offer referrals to each other. *See United States ex rel. Kester v. Novartis Pharms. Corp.*, 41 F. Supp. 3d 323, 337-38 (S.D.N.Y. 2014).

53.    Compliance with the AKS is a precondition to participation and to payment as a health care provider under Medicare.  *See generally United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011) (Medicare); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011) (Medicare); *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 53-54 (D. Mass. 2011) ("If providers could demand payment for claims resulting from kickback violations, then the Anti–Kickback Statute would be meaningless legislation.").  The Patient Protection and Affordable Care Act of 2010 amended the AKS to make clear that violations of the AKS can subject the perpetrator to liability under the federal FCA and to clarify that no actual knowledge of the section or specific intent to commit a violation of the section is required.  42 U.S.C. §1320a-7b(g), (h).  Accordingly, claims for payment for services that result from kickbacks are false or fraudulent under the FCA.

54.    Violation of the AKS subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

55.    Pursuant to provider agreements and claim forms, providers who participate in a federal health care program, including Medicare Part B, generally must certify that they have complied with all applicable federal and state rules and regulations, including applicable anti-kickback statutes.

### 1.    The Safe Harbors of the AKS

56.    The AKS contains safe harbors that exempt certain transactions from its prohibitions.  *See* 42 U.S.C. § 1320a-7b(3).  Once the Government has demonstrated each element of a violation of the AKS, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by such a safe harbor or exception.  The Government need not prove as part of its affirmative case that defendant's conduct at issue does not fit within a safe harbor.

*United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008). Conduct must fit squarely within a safe harbor to qualify for protection.

57. Relevantly, the regulations provide a safe harbor for "investment interests," applicable to compliant joint ventures. 42 C.F.R. § 1001.952(a). However, to qualify for this safe harbor, no more than 40% of the ownership of the joint venture may be offered to an investor in a position to influence referrals. 42 C.F.R. § 1001.952(a)(2)(i). If more than 40% of the investment interest is held by such an investor, the safe harbor does not apply. *See id.*

58. Under 42 U.S.C. § 1320a-7d(b), the HHS-OIG provides guidance to providers on whether proposed business arrangements risk violating the AKS. For example, a 1989 Special Fraud Alert warned against "suspect joint ventures" that are "intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals." *See* HHS-OIG Special Fraud Alert on Joint Venture Arrangements (the "1989 Special Fraud Alert on Joint Ventures"), reprinted in the Federal Register in 1994 (59 Fed. Reg. 65372, 65373 (Dec. 19, 1994)), http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html. The 1989 Special Fraud Alert on Joint Ventures noted that in "suspect" structures "one of the parties may be an ongoing entity already engaged in a particular line of business. . . . In some of these cases, the joint venture can be best characterized as a 'shell.'" *Id.* HHS-OIG also noted that "suspect financing and profit distributions" may be characterized by arrangements in which the "capital invested by the physician may be disproportionately small and the returns on investment may be disproportionately large when compared to a typical investment in a new business enterprise." *Id.*

59. In a 2003 Special Advisory Opinion, HHS-OIG provided common elements exhibited by "problematic" joint ventures:

**First**, the Owner expands into a related line of business, which is dependent on referrals from, or other business generated by, the Owner's existing business.

\*                 \*                 \*

**Second**, the Owner neither operates the new business itself nor commits substantial financial, capital, or human resources to the venture. Instead, it contracts out substantially all the operations of the new business. The Manager/Supplier typically agrees to provide not only management services, but also a range of other services, such as the inventory necessary to run the business, office and health care personnel, billing support, and space. While the Manager/Supplier essentially operates the business, the billing of insurers and patients is done in the name of the Owner.

\*                 \*                 \*

**Third**, the Manager/Supplier is an established provider of the same services as the Owner's new line of business. In other words, absent the contractual arrangement, the Manager/Supplier would be a competitor of the new line of business, providing items and services in its own right, billing insurers and patients in its own name, and collecting reimbursement.

**Fourth**, the Owner and the Manager/Supplier share in the economic benefit of the Owner's new business. The Manager/Supplier takes its share in the form of payments under the various contracts with the Owner; the Owner receives its share in the form of the residual profit from the new business.

**Fifth**, aggregate payments to the Manager/Supplier typically vary with the value or volume of business generated for the new business by the Owner.

HHS-OIG Special Advisory Bulletin, Contractual Joint Ventures (April 2003), http://www.oig.hhs.gov/fraud/docs/alertsandbulletins/042303SABJointVentures.pdf (emphasis added).

60.     HHS-OIG has also addressed AKS and safe harbor issues through Advisory Opinions. For example, in HHS-OIG Advisory Opinion No. 11-15 (October 3, 2011), https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-15.pdf, the OIG opined that the requestor's proposed arrangement—which the OIG characterized as similar to questionable joint venture arrangements that have been the subject of OIG guidance *supra*—did not meet any of the

potentially applicable AKS safe harbor (including the small entity investment safe harbor, 42 C.F.R. § 1001.952(a)(2)) and thus could potentially generate prohibited remuneration under the AKS.

61.     In HHS-OIG Advisory Opinion No. 97-5 (October 6, 1997), *see https://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf*, the OIG found that the small entity investment safe harbor did not apply, and in considering whether there was prohibited remuneration stated:  "However, even in situations where each party's return is proportionate with its investment, the mere opportunity to invest (and consequently receive profit distributions) may in certain circumstances constitute illegal remuneration if offered in exchange for past or future referrals.  Such situations may include arrangements where one or several investors in a joint venture control a sufficiently large stream of referrals to make the venture's financial success highly likely, or where one investor has an established track record with similar ventures or the financial investment required is so small that the investors have little or no real risk."  (*Id.* at p. 10.)

62.     In HHS-OIG Advisory Opinion No. 11-03 (April 7, 2011), *see https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/advopn11-03.pdf*, the OIG noted at page 4 its prior guidance expressing its "longstanding concerns about certain problematic joint venture arrangements between those in a position to refer business, such as the LTC [long-term care] Facilities here, and those furnishing items or services for which Medicare or Medicaid pays, especially when all or most of the business of the joint venture is derived from one or more of the joint venturers."  (*Id*. at p. 4) (citing 1989 Special Fraud Alert on Joint Ventures).  The OIG concluded at page 6:

> Accordingly, based on the facts presented here, we are unable to exclude the possibility that the Proposed Arrangement is designed to permit the Requestor [a long-term care pharmacy] to do indirectly what it cannot do directly; that is, to pay the LTC [Long Term Care] Facility owners a share of the profits from their

pharmaceutical products and services referrals. Indeed, there is a significant risk that the Proposed Arrangement would be an improper joint venture that would be used as a vehicle to reward the LTC Facility owners for their referrals.

### 2. *Fair Market Valuation*

63.     In multiple advisory opinions, the OIG has stated that a financial arrangement violates the AKS if "*one* purpose of the remuneration is to obtain money for the referral of services or to induce further referrals." *See*, *e.g.*, OIG Advisory Opinion No. 97-5, at 4 (Oct. 6, 1997), *http://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf* (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989), and *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985)) (emphasis in original). Even where there is more than one purpose of the remuneration, if one of them is to obtain money from referrals, the statute is violated. *Greber*, 760 F.2d at 72 ("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services."); *see also United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.*, 874 F.2d 20, 30 (1st Cir. 1989).

64.     Under the AKS, payment of more than "fair market value" for an item or service constitutes improper remuneration in violation of the law. *See* 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" under the AKS as "transfers of items or services for free or for other than fair market value.").

## VIII.  FACTS AND ALLEGATIONS

65.     Following its 2015 transaction involving illegal patient referrals from CRMC to a joint venture between BAYADA and CRMC, as early as May 2016, BAYADA proposed forming a similar joint venture to buy patients. This time, BAYADA proposed a joint venture it would enter into with MUSC SV that relied on referrals from MUSC to own and operate home health agencies/offices in South Carolina. MUSC is South Carolina's only comprehensive

academic medical center, and among other facilities, operates a 750-bed medical center and physicians' practices. *See http://www.muschealth.org/index.html*. As described by the parties in an August 10, 2016 commitment letter agreement:

> BAYADA is proposing the creation of a joint venture with Medical University of South Carolina's MUSC Strategic Ventures. **The purpose of the joint venture is to expand MUSC's capabilities to serve its patients** in a nine county area (Tier 1-Charleston, Berkeley, and Dorchester Tier 2- Georgetown, Orangeburg, Beaufort, Horry, Colleton, and Florence) outside of its existing campuses. The scope of services to be provided within the joint venture are Medicare Certified Home Health and Hospice services. (Emphasis added.)

Under the proposed arrangement, which was explicitly intended to provide home health services to MUSC's discharged patients, BAYADA would own 51% of the projected $30 million home health and hospice agencies' joint venture business, and MUSC SV would invest $245,000 and own 49% of the joint venture (exceeding the 40% limit in the AKS safe harbor for contractual joint ventures).

66.     As described herein, BAYADA had a practice of targeting hospitals to do joint ventures or partnerships specifically because hospitals discharge patients who make up a substantial referral base to home health agencies. Indeed, MUSC discharged patients worth approximately $20 million in Medicare referrals in the region to home health according to the 2014 Medicare data attached as part of Exhibit 3 to the commitment letter.

67.     BAYADA did not need any investment of money from MUSC or MUSC SV to fund a home health operation. Rather, BAYADA wanted MUSC's patient referrals (its post-acute home health and hospice patients) which is why BAYADA Hospital Managed Services Division representative Gerry Scrivener cold-called MUSC in the first place, and MUSC was willing to provide referrals in return for MUSC SV to obtain a share of the ownership and profit of the new joint venture. The parties' intent is evidenced in part through a series of emails

between June and August 2016, and in a commitment letter dated August 10, 2016 from Greg Bellomy of BAYADA to Patrick J. Cawley M.D., M.B.A., Executive Director/CEO Medical Center and VP for Clinical Operations, CEO, MUSC Health (also known as MUSC Strategic Ventures), and Vice President for Health Affairs, MUSC.

68.     David Baiada, who at the time was the Chief Operating Officer of BAYADA's Home Health Division, and who became BAYADA's CEO in 2017, had ultimate decision-making authority over BAYADA's joint venture transaction with MUSC SV.  Baiada, BAYADA's Chief Medical Officer Dr. Adam Groff, and Dr. Mark Lyles, MUSC's Chief Affiliations and Business Transformation Officer, all went to graduate school together at the Wharton School of the University of Pennsylvania.

69.     On June 23, 2016, Mr. Scrivener wrote to Dr. Lyles and asked him to provide BAYADA with the "Number of home health and hospice referrals made YTD respectively," as well as "What are the primary three hospices that MUSC is referring to?"  In response, Dr. Lyles forwarded an email to Mr. Scrivener from Greta Fowinkle, MUSC's Director of Case Management/Care Transitions, who indicated that MUSC's "Preferred providers for Hospice are:

1)  MSA – which includes the following – Hospice Care of America, Med Home Hospice, Hospice Care of Tri-County, and InCare Hospice
2)  Amedisys"

70.     On August 6, 2016, Greg Bellomy, BAYADA's Chief Strategic Growth Officer, wrote to Plaintiff-Relator and informed him that "**MUSC is already planning on terminating their preferred provider agreements with Amedisys and Gentiva, I am confident that they will support the JV with their referrals**."  (Emphasis added.)

71.     On August 8, 2016, Mr. Bellomy wrote to Dr. Lyles, and Sarah Bacik, Chief Strategy and Business Development Officer of MUSC Health (also known as MUSC Strategic Ventures), referring to his attached August 10, 2016 commitment letter, explaining that "we believe that between Home Health and Hospice, the **JV could generate approximately $30M of revenues** in the nine county area with Operating Income in the 8% - 10% range.  The pace of **achieving that will depend upon** state approval for new offices, capital requirements and **support from MUSC and affiliated hospitals**."  (Emphasis added.)

72.     The August 10, 2016 commitment letter to Dr. Cawley outlined the prospective financial benefits of the joint venture, including a pro-forma budget for the new entity **that was premised on MUSC's referrals of patients to the joint venture**.  In Exhibit 1 to the August 10, 2016 commitment letter, BAYADA projected revenue of $2,669,373 in year one (2017), $4,408,930 in year two (2018), and $4,973,128 in year three (2019).  The offering of a 49% interest to MUSC SV, its right to make a profit as a co-owner, and an infinite return on investment after year three (when all start-up capital will have been returned to MUSC SV) only happened because MUSC has the ability to deliver referrals from its hospital system to the newly formed joint venture home health agency.  Plus, MUSC SV's 49% interest would presumably be worth approximately 49% of the growing revenue over the years.  Thus, based on its projection of $4,973,128 in year three, the business would be worth about $5 million, and MUSC SV would own an interest worth approximately $2.45 million (49%) on an investment of some $245,000; in other words, a 1000% return in three years.  The future value of the business was and is substantial remuneration being offered in exchange for referrals, confirming the intent of the parties on August 10, 2016.

73.     On August 10, 2016, Relator questioned Mr. Bellomy on whether MUSC's doctors and discharge planners would stop referring patients to established competitors and whether his financial projections were realistic.  Mr. Bellomy's August 10, 2016 response to Relator revealed MUSC, MUSC SV and BAYADA's collective intention to violate the AKS: "Specific to the volume issue, I have been **very clear** with [Dr.] Mark [Lyles] and Sarah [Bacik] that **we have to achieve a certain census in order for this to be viable**.  They are **confident** that **they can deliver the referrals**."  (Emphasis added.)

74.     On August 12, 2016, Relator provided Mr. Bellomy with market data showing comparable start-up ventures by BAYADA in markets (New Jersey and Maryland) where BAYADA was already established, unlike in South Carolina.  In fact, BAYADA's projections for its joint venture with MUSC SV showed revenue that was more than two-times higher than the revenue BAYADA generated in similar ventures in established markets.

75.     Mr. Bellomy's August 12, 2016 response again makes clear MUSC, MUSC SV and BAYADA's intent to violate the AKS through illegal referrals from MUSC officials:  "The 7 agencies that serve Charleston received $8M of business from MUSC, I am confident we can capture 25% of that. **The [MUSC] Case Management team as well as the CEO and CMO have been part of every discussion.  This is going to be fine**."  (Emphasis added.) Getting the MUSC management team on board was essential so that BAYADA could be assured of the referrals, as BAYADA's mission was to buy the MUSC patients for its home health business so BAYADA could obtain a Certificates of Need ("CON"), a license and a Medicare provider agreement and expand into South Carolina.

76.     The BAYADA joint venture with MUSC SV that was agreed upon in concept in August 2016 was formalized in November 2016 (after Relator had been discharged by

BAYADA), and began operating on or around January 1, 2017.  The joint venture has three offices open so far—a home health agency ("HHA") in Charleston (provider number 42-7004), an HHA in Myrtle Beach (provider number 42-7135), and beginning on or about November 18, 2022, a home health hospice ("HOS") in Charleston (NPI 1780343400).  The two HHA offices are licensed in five South Carolina counties:  Berkeley, Charleston, Dorchester, Georgetown, and Horry.  The HOS office is licensed in seven South Carolina counties: Berkeley, Charleston, Dorchester, Florence, Georgetown, Horry and Marion.

77.    Because MUSC is not permitted to form a joint venture under the South Carolina constitution, MUSC caused MUSC Strategic Ventures (a South Carolina tax-exempt corporation, formed on September 2, 2015) and BAYADA to form SCHHA LLC, a Delaware LLC (dba MUSC Health at Home, By BAYADA) on November 22, 2016 to own and operate the South Carolina home health agencies/offices.  MUSC SV is a 49% member in the joint venture LLC entity, and BAYADA Home Care (a Hawaii 501c(3) non-profit corporation, formed on February 20, 2015) is a 51% member.  The LLC entity is an empty shell conduit that owns the Medicare provider numbers, CON, and the South Carolina home care and hospice licenses.  All operational, clinical, managerial and financial support systems will be and have been provided by BAYADA via a Management Agreement.  Neither MUSC SV nor MUSC have a meaningful day-to-day HHA or HOS operating role, and neither had HHA or HOS operating experience.

78.    The SCHHA LLC's operating agreement reflects that the "**purpose and business of the Company shall be to** (A) own a Medicare-certified home health agency and **provide post-acute home health care to patients of the Medical University of South Carolina** …".  (Emphasis added.)

79.     MUSC SV's economic interest in SCHHA LLC is its 49% share of the company's net profits, net losses and distributions.

80.     BAYADA placed its LLC ownership interest in the South Carolina home health care agency offices into a purportedly independent Hawaii tax exempt entity (which is supposed to benefit Hawaii residents) because MUSC and MUSC SV wanted a tax-exempt partner.

81.     BAYADA Home Health Care, Inc. ("BHC"), a for-profit entity at the time the joint venture formed, has a management agreement to manage both BAYADA Home Care (Hawaii) and MUSC Health at Home, by BAYADA (the dba for SCHHA, LLC).

82.     BAYADA is the sole member of BHC.  David Baiada is BHC'S principal officer.

83.     All of the operational, clinical, managerial, accounting, technology, marketing, advertising, recruiting and financial support systems for SCHHA LLC have been and currently are provided by BAYADA.

84.     Because MUSC caused private entity MUSC SV to form the joint venture with BAYADA, MUSC SV is liable for the joint venture's AKS violations:  BAYADA intended to provide, has provided, and is providing remuneration (something of value) to MUSC SV in return for MUSC SV's arrangement of referrals from MUSC as evidenced by the facts and the HHS-OIG's interpretation of the AKS.  The arrangement does not satisfy any of the elements of the AKS safe harbor (including because MUSC SV has a greater than 40% ownership interest). *See generally* discussion of HHS-OIG guidance, *supra*.

85.     Put another way, on August 10, 2016, BAYADA offered MUSC SV the opportunity to invest in a low-cost, low-risk, high-projected-return investment in exchange for

arranging for MUSC to deliver referrals to the joint venture; indeed, MUSC can substantially impact or control the joint venture's revenue by its willingness to steer referrals to the joint venture.

86.     MUSC SV's participation in the joint venture was intentional, and approved by MUSC SV's board of directors.  Mr. Bellomy wrote to Relator on August 8, 2016, stating the following:

> Spoke to Mark [Lyles] and learned the following:
>
> - The MUSC Ventures Board Meeting has been moved to Wednesday, so we need to finalize our document today.
> - MUSC Ventures is a new entity that hasn't been funded yet, so lower capital requirements over the next 60 days the better.

87.     On January 12, 2017, the joint venture board of managers held their inaugural meeting, with MUSC's Dr. Cawley and Dr. Lyles present as board members, along with BAYADA's Greg Bellomy and Brad Parrish.  At that meeting, the joint venture's managers discussed integrating the joint venture's home health offering with MUSC's case management teams and a roll-out plan for all sections of MUSC hospital, including providing education on the home health agency for MUSC general staff and physician leadership in February 2017.  Further, the managers recommended that regular weekly meetings continue between the joint venture and MUSC's Home Health Coordinator for, among other things, referral discussions.

88.     Therefore, MUSC SV knowingly entered into the joint venture to facilitate an illegal kick-back scheme that was dependent on MUSC's patient referrals.

89.     MUSC actively participated in this patient referral scheme by arranging patient referrals to the joint venture.

90.     For example, as of May 2017, the MUSC marketing department had introduced the joint venture HHA to various physician practices to become their provider of choice for home health care, and Dr. Cawley met with MUSC case managers to discuss how to present

the joint venture HHA to patients as the best option for their home health care. With MUSC's assistance, the joint venture also gained regular access to physician offices to assist the joint venture in increasing the practices' referral volume to the joint venture.

91.     Dr. Lyles and Dr. Cawley, in particular, were actively involved in getting MUSC case managers' commitments to creating a uniform way to discuss and present the joint venture as the best option for MUSC's patients. In addition, Hope Colyer, MUSC's then Director of Physician Services and current Manager of MUSC Referral Services, introduced the joint venture at her division meetings, and had MUSC Director of Nursing ("DON") travel with Katie Deerin, MUSC's former Affiliations Coordinator – Senior Living and Non-Acute Care, to physician offices to introduce the joint venture. Ms. Coyler assisted in getting the joint venture into physician practices to become their provider of choice. The MUSC DONs likewise helped the joint venture determine the correct referral coordinator in each physicians office.

92.     As further remuneration in return for referrals, BAYADA also held out to its potential joint venture partner the possibility that "once the JV is operational, BAYADA would consider providing the additional funding to support the growth with appropriate protections and reasonable interest, and/or securing a separate line of credit for the JV. These are outside of the scope of this document, but are things you should be aware that we are discussing internally." *See* August 8, 2016 email *supra* from Greg Bellomy of Bayada to Mark Lyles and Sarah Bacik.

93.     The 1989 (reprinted in 1994) and 2003 HHS-OIG alerts/advisories, *supra*, address AKS suspect joint ventures where one owner has the ability to refer, farms out the day-to-day operations to a contract manager, forms a shell entity, and allows the referral source to share in the profits. They speak directly to the suspect arrangements:

- Investors are chosen because they are in a position to make referrals

- One of the parties may be an ongoing entity already engaged in a particular line of business
- Amount of capital invested by the referral source may be disproportionally small, and returns on investment may be disproportionally large when compared to a typical investment in a new business enterprise
- Investors may be paid extraordinary returns on the investment in comparison with the risk involved
- The Owner contracts out substantially the entire operation to the Manager—otherwise a potential competitor—receiving in return the profits of the business as remuneration for its federal program referrals
- The Owner expands into a related line of business, which is dependent on referrals from, the Owner's existing business
- While the contract terms of these arrangements may appear to place the Owner at financial risk, the Owner's actual business risk is minimal because of the Owner's ability to influence substantial referrals to the new business
- The Owner and the Manager share in the economic benefit of the Owner's new business
- Aggregate payments to the Manager typically very with the value or volume of business generated for the new business by the Owner
- Expand into a health care service that can be provided to the Owner's existing patients
- The newly-created business predominantly serves the Owner's existing patient base (or patients under the control or influence of the Owner)
- The Owner's primary contribution to the business is referrals, it makes little financial investment in the business, delegating the entire operation to the Manager, while retaining profits from its captive referral base
- The Manager provides all of the following key services: day-to-day management, billing services, equipment, personnel and related services, office space, training, health care items, supplies and services—in general, the greater the scope of services provided by the Manager, the greater the likelihood that the arrangement is a contractual joint venture.
- Remuneration—The practical effect of the arrangement viewed in its entirety, is to provide the Owner the opportunity to bill insurers and patients for business otherwise provided by the Manager. The remuneration from the venture to the Owner (i.e., the profits of the venture) takes into account the value and volume of the business the Owner generates.

94.     HHS-OIG Advisory Opinions discussed *supra*, are directly on point with respect to the BAYADA/MUSC/MUSC SV arrangement. For example, in Advisory Opinion No. 11-15 (October 3, 2011), *supra*, the OIG noted that "The proposed arrangement appears to

have no business purpose other than to permit the **physician** investors to profit from the business they generate for the **Path Lab** in the form of **their laboratory specimen** referrals." (at p. 6, emphasis added). If one replaces the bolded words in the prior sentence of the Opinion with the operative words from the BAYADA/MUSC SV joint venture arrangement, one gets a sentence with an analogous situation and result: "The proposed arrangement appears to have no business purpose other than to permit the **MUSC SV** investors to profit from the business they generate for the **Home Health Agency** in the form of **the MUSC home health agency** referrals." The same is true for MUSC SV's opportunity to profit from the business it generates for the joint venture's HOS in the form of MUSC patient referrals.

95.     MUSC SV received payments from its joint venture with BAYADA that were intended to induce MUSC patient referrals to the joint venture's HHA.

96.     The HHS-OIG has similarly interpreted the term "remuneration" to cover "anything of value in any form whatsoever." *OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35958 (July 29, 1991).

97.     The Government would not, and in fact could not, have paid the claims if the Government knew that the Medicare claims that BAYADA caused to be submitted for its joint venture with MUSC SV starting in January 2017 and continuing to the present were and continue to be false, and the promise of illegal remuneration kickbacks to induce referrals in violation of the AKS.

A.     **Harm to the Government: Damages and Penalties**

98.     MUSC SV's joint venture scheme with BAYADA taint subsequent claims for services billed by BAYADA or the joint venture, or caused to be billed by BAYADA or the joint venture, to Medicare and other Government Health Care Programs.

99.    BAYADA's illegal arrangements with MUSC and MUSC SV have resulted in an estimated $59.4 million of false or fraudulent claims for payment from January 2017 to date, and continuing, for the HHA, in addition to the false claims associated with the HOS.

## IX.    CLAIMS FOR RELIEF

### Count I
### Federal False Claims Act – False Claims

### 31 U.S.C. § 3729(a)(1)(A) (2009)

100.    Plaintiff-Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

101.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

102.    By and through the acts described above, MUSC SV has knowingly presented or caused to be presented false or fraudulent claims for payment or approval.  MUSC SV entered the joint venture arrangement with BAYADA.  BAYADA then submitted, and continues to submit, claims to Medicare and other Government Health Care Programs, requesting payment for Home Health and Hospice services provided to patients referred by MUSC and serviced by the joint venture between MUSC SV and BAYADA.  Those claims are tainted, and thereby false, because of the illegal kickbacks that BAYADA provided to MUSC SV to induce MUSC to refer patients to the BAYADA-MUSC SV joint venture.

103.    The Government, unaware of the falsity of all such claims made or caused to be made by MUSC SV, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

104.    By reason of MUSC SV's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

105.    Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

**Count II**
**Federal False Claims Act – Conspiracy**

**31 U.S.C. § 3729(a)(1)(C) (2009)**

106.    Plaintiff-Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

107.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

108.    By and through the acts described above, MUSC SV has knowingly presented or caused to be presented false or fraudulent claims for payment or approval. MUSC SV entered the joint venture arrangement with BAYADA. BAYADA then submitted, and continues to submit, claims to Medicare and other Government Health Care Programs, requesting payment for Home Health and Hospice services provided to patients referred by MUSC and serviced by the joint venture between MUSC SV and BAYADA. Those claims are tainted, and thereby false, because of the illegal kickbacks that BAYADA provided to MUSC SV to induce MUSC to refer patients to the BAYADA-MUSC SV joint venture.

109.    The Government, unaware of the falsity of all such claims made or caused to be made by MUSC SV, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

110.    MUSC SV's acts described above in collaboration with MUSC and BAYADA constitute a conspiracy to violate the federal FCA. As a result of that conspiracy, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

111.    Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

## X.    PRAYERS FOR RELIEF

WHEREFORE, Plaintiff-Relator David Freedman prays for judgment against MUSC SV as follows:

A.    That MUSC SV is enjoined from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*;

B.    That judgment be entered against MUSC SV and in favor of the United States and Plaintiff-Relator in an amount equal to three times the amount of damages caused by MUSC SV's misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount;

C.    That MUSC SV be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

D.    That judgment be granted for Plaintiff-Relator against MUSC SV for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees permitted under 31 U.S.C. § 3730(d);

E.    That Plaintiff-Relator be awarded the maximum amount permitted under 31 U.S.C. § 3730(d); and

F.    That the Court award such other relief as the Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff-Relator requests a jury trial.

Dated:  November 26, 2025

Respectfully submitted,

LAW OFFICES OF BILL NETTLES

*/s/ William N. Nettles*
William N. Nettles
2008 Lincoln Street
Columbia, South Carolina  29201
Tel: (803) 814-2826
bill@billnettleslaw.com

David J. Chizewer (*pro hac vice* application forthcoming)
David E. Morrison (*pro hac vice* application forthcoming)
Daniel C. Mozley (*pro hac vice* application forthcoming)
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
Tel: (312) 201-4000
Fax: (312) 863-7472
david.chizewer@goldbergkohn.com
david.morrison@goldbergkohn.com
daniel.mozley@goldbergkohn.com

*Attorneys for Plaintiff-Relator,*
  *David Freedman*